## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **DAMION C. TURNER,** ) | **CASE NO. 1:12-CV-881** |
| ) | |
| **Plaintiff,** ) | **MAGISTRATE JUDGE** |
| ) | **GEORGE J. LIMBERT** |
| **v.** ) | |
| ) | **MEMORANDUM AND OPINION** |
| **COMMISSIONER OF** ) | |
| **SOCIAL SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Damion C. Turner Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his June 22, 2011 decision in finding that Plaintiff was not disabled because despite his impairments, Plaintiff was capable of making a vocational adjustment to a significant number of jobs in the national economy (Tr. 15-28).  The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

I.  PROCEDURAL HISTORY

Plaintiff filed his application for DIB on May 8, 2008 (Tr. 200-02), and filed his application for SSI on May 30, 2008 (Tr. 197-99).  He originally alleged disability since June 2, 2005 (Tr. 200), but amended his alleged onset date to March 20, 2008 (Tr. 72-74).  The

agency denied Plaintiff's applications at the initial stage of review on September 10, 2008 (Tr. 108-11, 112-14) and upon reconsideration (Tr. 125-31, 118-24).

At Plaintiff's request, ALJ convened an administrative hearing on August 3, 2010, in Cleveland, Ohio (Tr. 51-103). Plaintiff appeared with his counsel and testified (Tr. 60-90). Ted S. Macy, a vocational expert (VE), also testified (Tr. 90-101). The vocational expert also testified at a supplemental hearing held on May 12, 2011 (Tr. 35-50). On June 22, 2011, the ALJ issued a decision finding that despite his impairments, Plaintiff was capable of making a vocational adjustment to a significant number of jobs in the national economy (Tr. 15-27). Accordingly, the ALJ found that Plaintiff was not disabled through the date of his decision (Tr. 27).

The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner (Tr. 1-3). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g) and 1383(c)(3).

II.  STATEMENT OF FACTS

Plaintiff was born on February 22, 1975, making him thirty-six years old at the time of the ALJ's decision and therefore he was considered a "younger person" at all relevant times under the regulations (Tr. 197, 200). See 20 C.F.R. §§ 404.1563(c), 416.963(c) (defining a younger person as one who is under age fifty and, generally, whose age will not seriously affect his ability to adjust to other work). Plaintiff obtained his general education diploma in July 1994 (Tr. 62, 226, 341). Most recently, Plaintiff worked full-time after his

2

original date of onset as a material handler (Tr. 220, 229, 270) until February 2008, when his former employer laid him off (Tr. 58, 72, 341).  Plaintiff's earnings record indicated he collected unemployment benefits after being laid off (Tr. 212-14).

### III. SUMMARY OF MEDICAL EVIDENCE

#### A. Asthma

Plaintiff went to the emergency room in April 2008 with a report of asthma exacerbation (Tr. 320-21, 464).  Plaintiff complained of shortness of breath and stated that he ran out of his albuterol inhaler (Tr. 320).  The attending physician, Nana Kobaivanova, M.D., examined Plaintiff and reported normal findings (Tr. 464). She also reviewed a toxicology screen and noted that Plaintiff tested positive for opiates, benzodiazepines, and marijuana (Tr. 321). Also, , Dr. Andra Mirescu attended to the Plaintiff and reported him to be non-compliant with his medication (Tr. 338). A chest x-ray revealed unremarkable findings (Tr. 322-23, 480).  A subsequent study on September 17, 2008 also showed clear lungs and findings within normal limits (Tr. 497, 507, 515).

On January 8, 2009, Plaintiff saw Lina Tamrakar, M.D., for a follow-up appointment.  There, he stated that "his asthma [was] 'acting up' since 1 month" (Tr. 387). He reported extreme symptoms, such as wheezing and shortness of breath, when he just walks inside his house (Tr. 387). Physical examination confirmed some wheezing and decreased breathing sounds (Tr. 388). Dr. Tamrakar recommended that Plaintiff avoid triggers of his asthma (Tr. 388).

Plaintiff returned to Huron Hospital for a refill request in March 2009 (Tr. 469). He complained of chest tightness and wheezing (Tr. 469). He stated that he ran out of his

3

inhalers two weeks ago and could not afford Advair (Tr. 469). His doctor advised him to be compliant with medications (Tr. 470). Plaintiff returned for a follow-up visit in April 2010 (Tr. 466). Plaintiff reported still experiencing shortness of breath and wheezing (Tr. 466). He stated that he used his inhaler and nebulizer more than five times a day (Tr. 466). Dr. Yuji Umeda also recommended that he avoid triggers of his asthma (Tr. 467).

On August 7, 2009, Plaintiff went to the emergency room at Huron Hospital, complaining of an asthma exacerbation (Tr. 622-32). A chest x-ray taken on the same day revealed no evidence of active process and showed clear lungs (Tr. 558).

January 2010 progress notes indicate Plaintiff complained of breathing problems (Tr. 592). By April 2010, Plaintiff complained of worsening shortness of breath and wheezing (Tr. 586). He claimed that his symptoms wake him up at night. Physical examination, however, revealed that his lungs were clear to auscultation and no wheezing or rhonchi (Tr. 587). An April 17, 2010 x-ray of the chest showed clear lungs with no focal infiltrate, no pleural effusion, and no pneumothorax (Tr. 557). On the same date, urine drug analysis was positive for marijuana and opiates (Tr. 562). His doctor again recommended he stop using marijuana (Tr. 563).

Treatment notes dated May 5, 2010 described Plaintiff's asthma as controlled with medication. Plaintiff did not complain of any asthma-related symptoms (Tr. 551). In June 2010, Plaintiff returned for a visit but did not complain of any breathing problems (Tr. 546). A physical examination revealed lungs clear to auscultation and no wheezing or rhonchi (Tr. 547). By July 2010, hospital records indicated that Plaintiff felt better after

4

starting aymbicort (Tr. 572).  Physical examination again revealed no coughing, wheezing, or shortness of breath (Tr. 540).

On July 29, 2010, Dr. Kobaivanova provided a pulmonary medical source statement (Tr. 564-67). Dr. Kobaivanova noted that Plaintiff experiences asthma attacks due to an upper respiratory infection, allergens, irritants, and cold air/change in weather (Tr. 564).  Dr. Kobaivanova did not list exercise as a cause of Plaintiff's symptoms (Tr. 564). She also described the prognosis as "fair" (Tr. 565). She opined that Plaintiff could sit for less than two hours and stand/walk for less than two hours in an eight-hour workday (Tr. 565). She also concluded that Plaintiff would need unscheduled breaks every hour and could rarely lift up to ten pounds (Tr. 566). Dr. Kobaivanova opined that Plaintiff should avoid all exposure to extreme cold, extreme heat, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, and chemicals (Tr. 566).  Due to his depression, Plaintiff would also be incapable of even "low stress" jobs and would miss more than four days per month (Tr. 567).

    B.    <u>Hernia</u>

Plaintiff has a history of musculoskeletal problems related to a work-related accident in June 2007 (Tr. 485, 516). Plaintiff immediately reported pain in the abdominal region, and a physician diagnosed him with a recurrent umbilical hernia (Tr. 485). Plaintiff continued to work despite this pain and did not seek treatment until September 2008 (Tr. 70, 514). On September 24, 2008, Plaintiff underwent surgery to repair his hernia (Tr. 477, 491, 501, 509, 514, 529). Progress notes indicate the surgery was

5

successful and Plaintiff reported feeling much better (Tr. 514). On November 5, 2008, Plaintiff's surgeon, Jeffrey Parks, M.D., provided a medical source statement regarding Plaintiff's work ability (Tr. 511). Dr. Parks opined that Plaintiff was totally disabled from September 24, 2008, to November 24, 2008 (Tr. 511). Plaintiff reported a reoccurrence of abdominal pain in February 2009 (Tr. 516). However, upon examination, no recurrent umbilical hernia was noted (Tr. 517). Progress notes show Plaintiff repeatedly complained of abdominal pain from March 2009 to May 2010 (Tr. 518-27). However, a physical examination did not corroborate Plaintiff's complaints (Tr. 518-27). Plaintiff's doctor recommended physical therapy, but Plaintiff repeatedly refused (518-27). Objective evidence also did not corroborate Plaintiff's complaints of pain. An April 16, 2010, CT scan of the abdomen revealed no acute pathology and no evidence of appendicitis (Tr. 653). A more recent study of the abdomen and pelvis in February 2011 showed no mechanical intestinal obstruction, no focal inflammatory process, no organ abnormalities, and no recurrent hernia (Tr. 668).

    C.    <u>Degenerative Arthritis of the Right Knee</u>

In January 2009, Plaintiff began complaining of right knee pain (Tr. 387). He noted that Motrin relieved the pain (Tr. 387). Physical examination revealed normal gait and reflexes (Tr. 288). A January 2009 x-ray of the right knee revealed no evidence of fracture, dislocation, or joint effusion (Tr. 391, 479). Plaintiff again reported knee pain during a July 2009 office visit (Tr. 598). However, physical examination again revealed no deformities, edema, or skin discoloration (Tr. 600). Dr. Narsia described his gait and

reflexes as normal. Plaintiff's sensation was also grossly intact (Tr. 600). A July 2009 MRI also showed a normal right knee (Tr. 660). Plaintiff did not complain of right knee pain again until May 2010, when he received an injection to alleviate the pain (Tr. 551).

D.    Mental Impairments

At the Commissioner's request, Margaret Zerba, Ph.D., a psychologist, examined Plaintiff on July 21, 2008 (Tr. 340). Dr. Zerba diagnosed Plaintiff with major depressive disorder and assessed a GAF score of 50 (Tr. 343-44). She opined that Plaintiff's ability to understand and follow directions was not impaired (Tr. 344). Plaintiff's ability to pay attention and to perform simple, repetitive tasks are not impaired (Tr. 344). Plaintiff's ability to relate to others in a work environment was described as moderately impaired and his ability to withstand the stress and pressures of day-to-day work activity was said to be markedly impaired (Tr. 344). Dr. Zerba also opined that Plaintiff was incapable of managing funds (Tr. 344).

A February 23, 2009 neurological examination described Plaintiff as alert and oriented to time, place, and person, with a clear mental status with normal speech (Tr. 517). Plaintiff did not seek any mental health treatment until April 2009 (Tr. 466). He presented to orthopaedic surgeon, Dr. Yuji Umeda, M.D., and reported feeling down due to stress (Tr. 466). Dr. Umeda diagnosed Plaintiff with dysthymic disorder and prescribed Prozac (Tr. 467). By January 2010, Plaintiff's dysthymic disorder was described as "stable" (Tr. 594). In March 2010, a treating source at Northeast Ohio Neighboring Health Service diagnosed Plaintiff with depression (Tr. 526). In July 2010, Plaintiff's treatment

7

notes indicated his depression remained unimproved after four months of Lexapro (Tr. 572). It also noted that Plaintiff did not follow up with a psychiatrist for his depression (Tr. 539).

The record shows that Plaintiff infrequently followed up with mental health treatment until September 1, 2010, when Plaintiff sought treatment from Dr. James Pallas, M.D., at Levine Risen & Associates (Tr. 664-67). On September 1, 2010, Plaintiff reported insomnia and lack of energy. He denied suicidal thoughts and stated he worried a lot (Tr. 666). Dr. Pallas diagnosed Plaintiff with major depression and prescribed Cymbalta and Seroquel (Tr. 667). On September 27, 2010, Plaintiff returned to Dr. Pallas and reported "doing things more" and "getting out more" (Tr. 667). At the next visit, on October 25, 2010, Plaintiff explained that he was "not doing as well" and stated he was more anxious (Tr. 667). On November 22, 2010, Plaintiff reported improved sleep and reported that the higher dosage of his medication also alleviated his anxiety (Tr. 665). The following month, Plaintiff reported being "more social" and "feel[ing] like his old self" (Tr. 665). He reported no side effects (Tr. 665). After this visit in December 2011, the record reveals a gap in treatment. Plaintiff returned to Dr. Pallas on March 31, 2011, and reported becoming more isolated and afraid of social interaction (Tr. 665). Eighteen days later, however, Plaintiff felt improved and reported socializing more and feeling less anxious (Tr. 664).

E. Reviewing Opinion Evidence

On June 30, 2008, Leslie Rudy, Ph.D., an agency psychologist, reviewed the record

8

and found that prior to May 7, 2008, there was insufficient evidence to establish any medically determinable mental impairments (Tr. 363). Dr. Rudy determined that beginning May 8, 2008, Plaintiff had the medically determinable impairment of affective disorder, with only moderate limitations in concentration, persistence, or pace and social functioning and only mild limitations in activities of daily living (Tr. 349-62). Dr. Rudy opined that Plaintiff had moderate limitations in his abilities to complete a normal workday without interruptions, to interact with the public, to get along with co-workers, and to respond appropriately to changes in the work setting (Tr. 345-46). On March 4, 2009, Robyn Hoffman, another agency psychologist, affirmed Dr. Rudy's findings (Tr. 395).

On September 9, 2008, Leslie Green, M.D., an agency medical consultant, reviewed the medical evidence and noted that it showed a "10+ year history of asthma with infrequent ER visits" with non-compliance (Tr. 378-85). She stated that Plaintiff is prescribed Albuterol but history shows that he abuses his medication and runs out (Tr. 382). Dr. Green opined that Plaintiff had no exertional limitations but should avoid concentrated exposure to: extreme cold, extreme heat, wetness, humidity, and fumes, odors, dusts, gases, and poor ventilation (Tr. 382).

On March 5, 2009, Anton Freihofner, M.D., opined that Plaintiff retained the ability to perform medium exertional work that allows for avoidance of moderate exposure to pulmonary irritants, such as fumes, odors, dusts, gases, and poor ventilation (Tr. 397, 400). Dr. Freihofner noted that Plaintiff did not see a regular treating physician

9

until January 8, 2009 (Tr. 394). Dr. Freihofner found the evidence "suggests that he is non-compliant and abuses drugs that makes his asthma worse" (Tr. 394).

IV. SUMMARY OF TESTIMONY

At the August 3, 2010 hearing, Plaintiff's counsel conceded that Plaintiff's hypertension and migraines were non-severe impairments (Tr. 59). In addition, he acknowledged that there is no evidence to corroborate Plaintiff's recent complaints of hernia pain (Tr. 57).

Plaintiff testified that he worked as a material handler despite his long history of asthma (Tr. 63). He stated that he was laid off in February 2008 (Tr. 72). He explained that his asthma is the primary reason he cannot work (Tr. 76, 84-85). Plaintiff testified that chemicals, dust, or any strenuous physical activity cause asthma flare-ups (Tr. 76-77, 88). He stated that these flare-ups require him to use his nebulizer, which is a thirty-minute treatment (Tr. 77). Plaintiff said he also uses an inhaler and takes medication (Tr. 77, 85). Plaintiff admitted smoking marijuana during the relevant period (Tr. 78). He claimed that while it caused his asthma to flare up, it helped with his appetite (Tr. 79).

Plaintiff testified that he has no trouble taking care of his personal needs (Tr. 79). He stated that he does not perform any household chores (Tr. 79). He explained that he has never had to perform these activities because his mother or wife has always performed them (Tr. 79). Plaintiff's activities include using the computer, talking to his wife, and visiting his mother (Tr. 80-81).

Plaintiff testified he takes Lexapro for his depression and anxiety (Tr. 78).

However, he said that it makes him feel dizzy (Tr. 78).

Ted S. Macy testified as a VE at the hearing (Tr. 90-101). The VE previously reviewed Plaintiff's past work history and testified that his past job, classified in the Dictionary of Occupational Titles (DOT) as a material handler, required medium to heavy exertion and semi-skilled work (Tr. 92). The ALJ asked the VE to consider an individual with Plaintiff's education and work experience, with the following limitations: lifting and carrying no more than fifty pounds occasionally, twenty-five pounds frequently; avoid moderate exposure to irritants such as fumes, odors, dusts and gas, and poorly ventilated areas and no exposure to hazards or heights. (Tr. 93). The VE testified that such an individual could not perform Plaintiff's past jobs (Tr. 93-94). Thereafter, the VE considered job possibilities in the regional economy or national economy for such an individual (Tr. 94). He stated that jobs such as bench assembler, laundry worker, and wire worker, would accommodate such an individual (Tr. 94).

At the supplemental hearing on May 12, 2011, the VE testified that based on the ALJ's hypothetical laid out in the interrogatory dated December 23, 2010, which included additional environmental and mental restrictions (Tr. 276-79), Plaintiff could still perform jobs such as packager, bench assembler, and wire worker (Tr. 46).

V.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1.     An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R.

404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c) and 416.920(c) (1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See*, *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir.1990).

VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall

12

be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See*, *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See*, *Walters v. Commissioner of Social Security*, 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. <u>See</u>, *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. See, id., Walters, 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See*, *Houston v. Secretary of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

VII. <u>ANALYSIS</u>

Plaintiff raises a single issue. Plaintiff claims that the ALJ failed to give controlling weight to the opinion of the treating physician.

Disability and residual functional capacity opinions are reserved for the ALJ. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (disability opinions); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (RFC opinions). Thus, an ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) . . . ." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

Next, although a treating physician's opinion is generally entitled to additional, and

sometimes even controlling weight due to the nature of the treatment relationship, such opinions may be discounted if good reasons are provided. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (stating that an ALJ must give special attention to opinions from treating sources). To be entitled to controlling weight, a treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and must not be "inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Social Security Ruling (SSR) 96-2p.

Dr. Kobaivanova's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques and was also contradicted by other substantial evidence. Dr. Kobaivanova opined that Plaintiff could rarely lift ten pounds and could never lift more than ten pounds. She also opined that Plaintiff could stand and walk for less two hours during an eight-hour workday, and sit for less than two hours during an eight-hour workday (Tr. 565), but did not explain the basis for these conclusions or indicate what medical findings supported these conclusions (Tr. 564-567). In accordance with her treatment notes from Dr. Kobaivanova's office, objective reports did not corroborate Plaintiff's complaints of knee pain or abdominal pain (Tr. 391, 479, 660). Furthermore, several physical examinations revealed Plaintiff's extremities to have no deformities or edema (Tr. 23, 288, 660). In addition, treating sources observed Plaintiff's gait and sensation to be normal (Tr. 23, 288, 660). Dr. Kobaivanova's opinion is also contradicted by other substantial evidence.

The ALJ opined that Plaintiff remained capable of communication with others regularly, including visiting his mother (Tr. 25). Mental health records disclosed that Plaintiff felt more sociable and experienced no side effects from his medications (Tr. 664-65). Plaintiff's daily activities, including using his computer, reading internet articles, and checking e-mail messages (Tr. 26, 80-81), are also inconsistent with Dr. Kobaivanova's opinion of extreme limitations.

An ALJ can reject the opinions of treating physicians that are inconsistent. 20 C.F.R. §§ 404.1527(c)(2), (d)(3), (4), 416.927(c)(2), (d)(3), (4). Here, Dr. Kobaivanova's opinion was internally inconsistent because she noted that Plaintiff's prognosis was "fair" but found extreme limitations, including an inability to stand more than fifteen minutes (Tr. 565). The ALJ was correct in giving Dr. Kobaivanova's opinion less than controlling weight.

When a treating source opinion is not entitled to controlling weight, the regulations provide that the ALJ may consider several factors when determining what weight to give the opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The factors include the examining relationship, treating relationship (its length, frequency of examination, and its nature and extent), the supportability by clinical and laboratory signs, consistency, specialization, and other enumerated criteria. 20 C.F.R. §§ 404.1527(d), 416.927(d). Here, the ALJ explicitly considered Dr. Kobaivanova's opinion, and gave it some, but not controlling weight (Tr. 24-25). Dr. Kobaivanova reported that she treated Plaintiff since January 2009 on a monthly basis (Tr. 564). The ALJ found that the limitations that

Dr. Kobaivanova offered in her opinion were contradicted by Plaintiff's progress notes and with other assessments and opinions (Tr. 24-25). Dr. Kobaivanova opined that Plaintiff should avoid all exposure to extreme cold, extreme heat, high humidity, wetness, cigarette smoke, perfumes, smoldering fluxes, solvents, and cleaners, fumes, odors, gases, dusts, and chemicals. However, as the ALJ pointed out (Tr. 22), recent treatment notes indicate that Plaintiff recently experienced fewer episodes of shortness of breath and asthma exacerbations (Tr. 546, 551, 572). These findings were made despite Plaintiff's failure to comply with his medication and smoking of marijuana (Tr. 563). Objective evidence also frequently revealed clear lungs (Tr. 497, 557, 558). In addition, the ALJ noted that Plaintiff worked for many years at substantial gainful activity even though he had an asthmatic condition (Tr. 22). Also, after Plaintiff was laid off, Plaintiff collected unemployment benefits 1 (Tr. 212-14). Hence, he had to attest that he was ready and able to work. Ohio Rev. Code Ann. § 4141.29(A)(4)(a).

The undersigned finds that substantial evidence supports the ALJ's evaluation of Dr. Kobaivanova's opinion. Based in part on Dr. Kobaivanova's opinion, the ALJ limited Plaintiff to avoid moderate exposure to extremes in temperature (Tr. 20).

## VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms that ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform medium work that allows for standing/walking six hours and sitting four hours in an eight-hour workday; avoidance of

16

even moderate exposure to temperature extremes; and avoidance of concentrated exposure to wetness, humidity, fumes, odors, dusts, gases and poorly ventilated areas and exposure to hazardous machinery and unexpected heights. In addition, Plaintiff is limited to performing simple and routine tasks, involving only superficial interaction with co-workers and the public, and is precluded from performing tasks that involve high production quotas and strict quota time requirements.

Therefore, based upon substantial evidence, the ALJ correctly determined that Plaintiff was not disabled. Hence, he is not entitled to DIB and SSI.

**IT IS SO ORDERED.**

Dated: January 15, 2013  */s/George J. Limbert*
**GEORGE J. LIMBERT**
**UNITED STATES MAGISTRATE JUDGE**